COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JUAN JOSE ORTEGA, | § | No. 08-23-00023-CR |
| Appellant, | § | Appeal from the |
| v. | § | 399th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| Appellee. | § | (TC# 2018CR12021) |

## MEMORANDUM OPINION

A jury convicted Appellant Juan Jose Ortega of murder for fatally stabbing Guy LaRue. Appellant challenges his conviction in one issue, arguing that the evidence is legally insufficient to support his conviction because the State failed to disprove that he acted in self-defense when he stabbed Guy. For the following reasons, we affirm.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

#### (1) *The stabbing*

Appellant was Guy's longtime friend and coworker. Guy had arranged for Appellant to work with him at a construction firm as a deliveryman. According to Guy's wife Mayra, Appellant

---

[1] This case was transferred from our sister court in San Antonio, and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

and Guy "would hang out all the time after work." On August 18, 2018, Guy was at a baby shower at a house in San Antonio with his mother Lorena, his brothers Gary and Jack, Mayra, and about 60 other people. Appellant was also at the shower. Guy told Mayra he was not expecting Appellant at the shower because he thought it was a family-only event, but nobody asked Appellant to leave.

After the shower, Guy's family and Appellant went to Lorena's house to spend more time together. At approximately 8:00 or 9:00 p.m., Appellant, Guy, and Mayra began drinking alcohol in the backyard. Although she did not see them smoking marijuana that night, Lorena knew Appellant and Guy had smoked marijuana together before. Appellant asked if he could spend the night at Lorena's house, and she made a bed for him on the floor of an office in the house. Lorena went to sleep at approximately 2:00 a.m. Guy, Mayra, Jack, and Appellant stayed outside the house and continued drinking beer together. Mayra drank a 12-pack of beer while Guy, Gary, and Appellant shared a 24-pack of beer. According to Mayra, the group spent the time playing drinking games and listening to music.

At some point, Mayra and Jack noticed that Guy, Gary, and Appellant began talking about Appellant's frequent tendency to take time off at work, which caused Guy's supervisors to criticize Guy because he had gotten Appellant the job. Gary, who worked at the same company, told Appellant that he "need[ed] to do better and he [was] making us look bad." Mayra and Jack recalled that Guy "wasn't getting mad at [Appellant] or anything like that" but was "encouraging him to do better." Appellant's tone of voice became "defensive" due to the topic of conversation, but Guy's voice remained "normal." Gary left at around midnight, and Mayra went to sleep at approximately 3:00 or 4:00 a.m., leaving Guy, Jack, and Appellant outside to continue the conversation about work. Jack eventually decided to go to sleep and told Appellant and Guy to stop talking about Appellant's work ethic because Jack "[didn't] want nothing to happen."

2

Appellant and Guy changed the topic. Jack then went inside the house to go to sleep while Appellant and Guy continued to talk outside.

Early the next morning, Mayra awakened to banging on the front door of the house. Mayra opened the door and found Appellant covered in blood. Appellant was shouting for Lorena and "screaming and saying he made me do it." When Lorena came into the room, Appellant got on his knees and told her he was sorry. Mayra asked where Guy was, and Appellant pointed toward the street. Mayra went outside and found Guy lying face-down in the street covered in blood. Appellant went inside and began "rolling around" in Lorena's kitchen and yelling that Guy had stabbed him in his arm. Appellant was covered in blood, but Lorena did not see any injuries on his person. Lorena called 911 after Mayra came back inside and told her to do so. At some point, Appellant ran out of the house and into the driveway as police officers arrived.

### (2) Law-enforcement investigation

#### (a) On-scene investigation

At 5:21 a.m. on August 19, 2018, a 911 dispatcher received the call from Lorena, who stated that her son was in the street and unresponsive after being stabbed in the neck. Guy was still breathing at the time. Lorena handed the phone to Mayra, who attempted to stop the bleeding from Guy's neck with a plastic bag, but she told the dispatcher that Guy was unresponsive. Guy's father-in-law attempted to perform CPR, but he told the dispatcher that Guy had stopped breathing. Mayra stated that Appellant was still at the house and had claimed Guy had tried to stab him. Appellant was crying. Mayra shouted at Appellant, "You didn't have to stab him, Juan!" Another man shouted, "You killed him!"

Police were dispatched to the scene, including Officer Abigail Bass of the San Antonio Police Department (SAPD). Bass recalled that when she arrived on scene, she placed Appellant in handcuffs so that EMS could begin to work on Guy. Bass saw that Appellant had non-life-

3

threatening injuries, which justified Appellant being transported to police headquarters instead of to a hospital. Appellant was "distressed," told Bass that "his head was stomped on," and made incoherent statements, although he seemed to understand what Bass was saying to him. Bass's bodycam footage also showed Appellant sobbing as he told Bass: "I was protecting myself. I didn't want this to happen," "It was self-defense. He was trying to kill me." "Is he okay?" "Why did you have to fucking hit me?" "He hit me first. I was just trying to go home. I was just trying to go home and he got on top of me . . . and he just decided to fucking hit me. Like we're drunk and whatever, and he just decided to fucking hit me." "He stomped on my head." Guy grabbed the knife from his pocket. Appellant also admitted he was trying to punch Guy and he kicked him. Bass noted that Appellant had a "strong odor of intoxicants coming from . . . his person, [and] he had slurred speech," which indicated Appellant may have consumed alcohol. Bass saw containers with alcohol in the backyard. After receiving consent to search the house, Bass and other officers went inside and found blood on the floors.

Officer Theo Weathersbee, who also responded to the scene, recalled that Appellant was covered in blood and had an injury to the back of his head. EMS personnel evaluated Appellant at the scene and determined that his injuries were not life-threatening and recommended applying ice. Appellant told Weathersbee the stabbing was an "accident, [and Guy] was trying to take the knife from him, . . . [and Guy] pushed him down." Weathersbee also believed Appellant was intoxicated and recalled that Appellant could not tell him the time or correctly identify the current United States President. Weathersbee heard Lorena accuse Appellant of stabbing Guy in the neck, and Appellant responded to Lorena that Guy was trying to take the knife from him.

Officer Yvonne Diaz, another officer at the scene, testified that she photographed blood on the street in front of the house and on the driveway, front patio, and the floors of the interior rooms of the house. Diaz found a knife on the street underneath a police vehicle. She took photographs

4

of Appellant, who was handcuffed. Appellant appeared to have sustained several injuries to his head and had blood and dirt on his face. According to Diaz, Appellant could not stand unassisted at the time and was covered "almost head to toe" with blood. Diaz also photographed an overturned chair and a container with bottles of alcohol on the patio.

(b) *Appellant's interview*

Appellant was transported from the scene to police headquarters to be interviewed. By that point, Weathersbee recalled that Appellant's mental condition seemed to have improved, but he still appeared to be inebriated. Detective Mark Duke was assigned to investigate the stabbing, and he interviewed Appellant at police headquarters. Appellant vomited in the interview room before the interview began. He was "emotional" and had trouble answering some questions, but Duke believed Appellant was "okay" physically.

After Appellant was moved to another room, he told Duke he was "really scared" during the incident and Guy became "real[ly] violent" and started hitting him. Without being asked, Appellant stated that Guy had been on top of him and Appellant pushed Guy up. According to Appellant, Guy was his "best friend" and had "smashed [his] head on the concrete and started punching [him] in [his] face." Appellant said his head "really hurts." Duke noted "road rash" on Appellant's shoulder caused by falling to the ground. Appellant apologized to Duke because his speech was slurred due to a mouth injury Guy caused "when [Appellant] was trying to get away." Appellant stated he and Guy got "really drunk" and began complaining to Appellant about his work. Appellant got tired of it and planned to go home, but Guy "started fighting with [him] and threw himself on top of [Appellant], and [Appellant] was just trying to get away." Guy threatened to kill Appellant, and Appellant "did not want to fucking die." At this point, Duke read and explained to Appellant the *Miranda* warnings, and Appellant stated he understood his rights.

5

Appellant explained he worked with Guy, who was a mechanic on handheld tools. Prior to the stabbing, they had been at a baby shower for Guy's brother. Guy had consumed "a lot" of alcohol, and Appellant was "really drunk" and had "blacked out" from drinking alcohol prior to the stabbing. Appellant also stated he and Guy had consumed marijuana and cocaine. While they were drinking outside of Guy's house, Appellant and Guy got into an argument over work. Guy "got violent" when he and Appellant argued about work because Appellant "slacks off." Appellant felt "intimidated," but not angry, about the way Appellant criticized him.

Appellant began to "sober up" and said he was going to leave, but Guy "grabbed [him] and started punching [him] and hitting [him]. [Appellant] tried getting away and tried running to the street." Guy started grabbing Appellant by his arms and threw him down and got on top of him. Guy hit Appellant in the face and slammed his head on the concrete. Duke commented that Appellant's face looked swollen, and Appellant stated that it was swollen because Guy had "slammed [his] head on the concrete [and he] was trying to get away from [Guy.]" Appellant "hit [Guy] a couple times trying to get [Guy] off of him." Guy was "angry" during the fight. Appellant did not believe he could have gotten away from the fight.

Nevertheless, Appellant managed to get away from Guy, but Guy got on top of Appellant again and began reaching into Appellant's pockets. Appellant thought Guy was attempting to get Appellant's knife that he used to open boxes at work "to intimidate [him]." Appellant tried to push Guy off of him. Appellant "thought [Guy] was going to kill [him]" and was "in fear for [his] life and was trying to get away." Guy took the knife away from Appellant and raised it above Appellant. Appellant then tried to get the knife and pushed upwards to get Guy off of him; he did not know for certain how Guy was stabbed, but Appellant believed Guy could have been stabbed when he fell on the knife. Appellant recalled being covered in blood and initially believing it was

his own blood. After the stabbing, Appellant told Guy's family what had happened and learned it was Guy's blood.

During a break in the interview, Appellant twice called his mother and told her he had "gott[en] into some shit" and was unsure if she would ever see him again. Appellant told his mother that he had gotten into a fight with Guy and tried to get away from him. Appellant explained that Guy had grabbed his knife and tried to stab him, but Guy ended up stabbing himself.

In sum, Appellant denied starting the fight with Guy and claimed he attempted to get away from Guy because he was "in fear for [his] life." Appellant also claimed that Guy, who was 6'3" or 6'4", was larger and stronger than Appellant, who himself is 6'1" and weighs over 300 pounds.

(c) *Subsequent events*

After being interviewed, Appellant was arrested and transported to the Center for Health Care Services in San Antonio, which had a grant with SAPD to examine injured prisoners before they appeared before a magistrate. Fausto Saa, an advanced nurse practitioner, performed a medical examination of Appellant at 9:45 a.m. for medical clearance prior to his jail transport. Saa noted that Appellant reported he had been "assaulted by a friend and that he had a swelling to the back of his head, which is a hematoma to the posterior head. He was complaining of dizziness. He stated loss of consciousness . . . [and Saa] saw bleeding from both ears." Saa observed that Appellant had "abnormal vital signs," with elevated blood pressure, heart rate, and body temperature.

Saa physically evaluated Appellant and found abnormalities in his head, gait, ears, nose, and throat. Saa wrote in his report that Appellant had a "large hematoma to the posterior occipital region; bleeding from the right ear canal; follows commands with a staggered delay; positive horizontal nystagmus; right labial swelling; . . . a staggered gait [, and] positive cervical tenderness." Using an audioscope, Saa ruled out the possibility that the blood in Appellant's right

7

ear came from another person. Given Appellant's "staggered delay" (i.e., delay in following Saa's commands), Saa suspected Appellant had a possible head injury. A sample of Appellant's breath showed his BAC at the time was .072. According to Saa, vomiting is a sign of a concussion. Saa suspected Appellant's loss of consciousness was more likely due to a head injury "because of the size of the hematoma and his nystagmus" and because of Appellant's relatively low BAC, but Saa could not rule out alcohol consumption as having contributed to Appellant's impaired motor function and nystagmus. Saa did not find evidence of a brain bleed, but based on the possibility that Appellant had a head injury, Saa did not medically clear Appellant to go to the jail and instead had him sent to the hospital in a 911 transport. According to a CT scan of Appellant's brain, Saa did not believe the wounds were life-threatening. Saa opined that with Appellant's injuries, sustaining further blows to the head by having it slammed against pavement could have caused him to suffer more serious injuries.

Kimberly Molina, the chief medical examiner for the Bexar County Medical Examiner's Office, testified that she reviewed Guy's autopsy report but did not perform the autopsy herself. Guy was approximately 6'4" in height and weighed 386 pounds at the time of his autopsy. The autopsy showed that Guy sustained a stab wound to his face, two stab wounds and one incised wound (i.e., a wound longer than it is deep) to his neck, two stab wounds and an incised wound on his back, and an incised wound on his left hand that Molina opined was consistent with being defensive in nature. Molina opined that the stab wound to the lower part of the right side of Guy's neck caused his death by severing a blood vessel that caused him to lose an excessive amount of blood. Molina stated that Guy's wounds could be consistent with coming from a source in front of Guy, but they would not likely be consistent with the decedent holding a knife and being pushed upward by a person underneath the decedent, which would be "theoretically . . . possible, although improbable."

8

Testing of Guy's blood during his autopsy showed the presence of cocaine byproducts and a blood-alcohol concentration (BAC) of 0.117 grams per decaliter. Appellant's medical records showed that in addition to alcohol in his system, his blood had the presence of cannabinoid (i.e., marijuana) and cocaine. Appellant's records also showed a perforated eardrum immediately after the stabbing, and "post-traumatic headache" and "headache daily, lasting a few hours" months after the stabbing.

## B. Procedural history

The State of Texas charged Appellant with murder, alleging in separate paragraphs: (1) Appellant intentionally and knowingly caused Guy's death by cutting and stabbing him with a knife; and (2) Appellant, with intent to cause serious bodily injury to Guy, committed an act clearly dangerous to human life that caused Guy's death by cutting and stabbing him with a knife.

At trial, the State conceded that Appellant and Guy engaged in a "scuffle" prior to the stabbing, that Appellant did not flee the scene after the stabbing, and that Guy's physical size "could pose a physical threat to just about anyone." But according to the State, Appellant asserted that he did not act in self-defense when he stabbed Guy. In particular, the State argued that Appellant had "stabbed [Guy] in the back," that the evidence did not suggest Appellant had a head injury that could have justified his use of deadly force against Guy, and that Appellant's differing versions of events recounted at the scene and in his interview rendered his story not credible. The State also argued that the evidence suggested Appellant did not sustain sufficiently significant injuries to justify the use of deadly force that was immediately necessary to prevent his death or serious bodily injury.

Appellant's trial theory was that he acted in self-defense when he stabbed Guy due to his reasonable use of deadly force that was immediately necessary to protect himself against Guy's act of smashing Appellant's head on the asphalt while Guy was positioned on top of him, which

9

caused him to suffer injuries to his head and ear and to be mentally incoherent. Appellant argued that Guy weighed approximately 386 pounds and was physically larger than Appellant, which tended to make his use of deadly force reasonable. Appellant also argued the medical testimony showed that because head injuries can be life threatening and the evidence suggested Appellant had a head injury, he was justified in using deadly force against Guy. Appellant further argued Guy was intoxicated during the fight and had a history of physical violence against others, both of which made it more likely that he was the first aggressor in the fight with Appellant. Appellant conceded that his interview statement to Duke that Guy sustained his injuries by falling on the knife was inconsistent with the other evidence, but Appellant argued his incoherence caused by the head injuries caused him to put forth this unreasonable explanation for Guy's injuries. Finally, Appellant posited that the pattern of stab wounds over Guy's body showed a "desperate" attempt to stop Guy from beating him rather than "targeted" blows suggestive of some premeditated intent to kill Guy.

The trial court instructed the jury on self-defense. The jury found Appellant guilty of murder. During the punishment phase of trial, Appellant requested and received an instruction on the issue of sudden passion, and the jury affirmatively found that Appellant acted under the influence of sudden passion when he killed Guy. The jury assessed punishment of nine years' imprisonment. Appellant filed a motion for new trial and motion in arrest of judgment that were overruled by operation of law. This appeal followed.

## II. DISCUSSION

In his sole issue, Appellant argues that the evidence is legally insufficient to support his conviction because the State failed to disprove that he acted in self-defense when he stabbed Guy.

10

## A. Standard of review

The Fourteenth Amendment's due-process guarantee requires that legally sufficient evidence support every conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In a legal-sufficiency challenge, we focus solely on whether the evidence, when viewed in the light most favorable to the verdict, would permit *any* rational jury to find the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19; *Brooks*, 323 S.W.3d at 912 (establishing legal sufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

In employing this standard, we recognize the jury is the sole arbiter of witness credibility and the weight attached to witness testimony. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Only the jury acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts[.]" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. at 319). In doing so, the jury may choose to believe or disbelieve any testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and [ ] defer to that determination." *Dobbs*, 434 S.W.3d at 170 (citing *Jackson*, 443 U.S. at 319). In conducting a legal-sufficiency review, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988) (en banc) (emphasis omitted). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 318).

When a defendant raises a self-defense claim that justifies his use of force, he bears the burden to produce evidence supporting the defense. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). The burden of production is to "adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id.* Once the defendant produces evidence supporting the defense, the State bears the burden of persuasion to disprove the raised issues. *Id.* The burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Id.* (citation and quotation marks omitted).

In a review of the sufficiency of the evidence pertaining to self-defense, we do not look to whether the State produced evidence refuting the defendant's claim, "but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and would also have found against [A]ppellant on the self-defense issue beyond a reasonable doubt." *Id* at 609. Self-defense is an issue of fact for the jury to decide, and when a jury renders a finding of guilt, it is implicitly rejecting the defense. *Id.*

### B. Law of self-defense

Under Texas law, "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). "Reasonable belief" is defined as one that would be held by "an ordinary and prudent man in the same circumstances as the actor." *Id*. § 1.07(a)(42). Use of force is not justified in response to verbal provocation alone. *Id.* § 9.31(b)(1).

A person is justified in using deadly force in self-defense if he would be justified in using force against another person under § 9.31 and if the person "reasonably believes the deadly force

is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force . . . [or] to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." *Id.* § 9.32(a). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

### C. Analysis

On appeal, Appellant does not argue that the State failed to prove the elements of murder. Instead, he contends the State failed to meet its burden to disprove self-defense beyond a reasonable doubt because he was justified in using deadly force to protect himself against the risk of death or serious bodily injury caused by Guy. In support of his position, Appellant points to: (1) Guy's heavy weight and his position over Appellant while on the street, as shown by Duke's testimony that the blood evidence suggested Guy was over Appellant when he was stabbed; (2) Appellant's request for medical assistance to help Guy; (3) the lack of evidence showing a propensity for physical violence on Appellant's part; and (4) Guy's history of physical violence against Mayra.

Other than Appellant's claim that Guy started the physical fight, the evidence viewed in the light most favorable to the verdict suggests that Appellant could have started the physical fight, especially in light of Mayra and Jack's testimony that Guy was calm when speaking to Appellant about his work ethic while Appellant became defensive due to the accusations. Although the record shows Guy had a history of physical violence and that Appellant did not flee the scene after the stabbing, the jury was free to weigh this evidence less heavily than Mayra and Jack's testimony suggesting Appellant started the fight. It was the jury's role to determine who started the physical confrontation between Appellant and Guy. *See Lozano v. State*, 2019 WL 5616975, at *15 (Tex.

13

App.—El Paso Oct. 31, 2019, *rev'd on other grounds*, 636 S.W.3d 25 (Tex. Crim. App. 2021)) (recognizing that it is the jury's province to determine the identity of the person who started a confrontation in determining a self-defense claim). Given the evidence, the jury could have chosen to disbelieve Appellant's version of events and instead rationally infer Appellant was the initial aggressor in the physical fight that led to Guy's stabbing.

Given that there were no witnesses to the fight other than Appellant, who did not testify, there is no direct evidence of exactly how the fight progressed. Injuries to Appellant's head and shoulder imply that he and Guy physically fought each other at some point after everyone went to sleep. An overturned chair in the backyard and Duke's testimony about his investigation suggest that the fight started in the backyard and moved into the street. Testimony from Duke and Molina about Appellant being covered in blood established that Appellant was likely underneath Guy at some point after Guy was stabbed. Moreover, it is undisputed that Guy was physically larger than Appellant and outweighed him by approximately 60 pounds, which could support Appellant's claim that deadly force was immediately necessary to stop Guy from causing him serious bodily injury or death due to Guy's large physical size.

Nevertheless, other than Appellant's claims at the scene that Guy was smashing his head into the concrete when he stabbed Guy to protect himself, there is no evidence indicating Guy was causing Appellant's injuries, i.e., using potential deadly force, at the precise moment Appellant used deadly force against Guy, rendering Appellant's use of deadly force immediately necessary. In contrast, the evidence suggests that the fight started in the backyard and that Appellant could have stabbed Guy before he was on top of Appellant in the street. The jury was free to reject Appellant's assertions to the contrary and could have rationally found that Appellant was not justified in his use of deadly force that was "immediately necessary" at the time he stabbed Guy. *See* TEX. PENAL CODE ANN. § 9.31(a).

Additionally, the jury could have found that due to the number of knife wounds to Guy's body, the force Appellant used was not immediately necessary to protect himself against Guy's use or attempted use of force, especially given the knife wound to Guy's hand, which Molina testified was consistent with being defensive in nature. *See Vasquez v. State*, 2 S.W.3d 355, 358–59 (Tex. App.—San Antonio 1999, pet. ref'd) (large number of stab wounds, including multiple stab wounds to the victim's back, suggested defendant's use of deadly force was not immediately necessary to protect himself against the victim's use of deadly force). The jury was free to reject Appellant's unlikely claim during his interview with Duke that Guy sustained seven stab wounds to his face, neck, back, and hand by accidentally cutting himself after Appellant pushed up against him while they were fighting in the street—a claim Molina testified was "improbable" given the nature of Guy's wounds. Moreover, given the medical testimony in the record, the jury could have also concluded that any impairment of Appellant's mental and physical faculties was due to Appellant's alcohol intoxication and not due to the wounds he sustained, thus undermining his assertion as to the degree of force Guy used.

Viewing the evidence in the light most favorable to the verdict, we conclude that any rational jury could have found that the State disproved Appellant's self-defense claim beyond a reasonable doubt. Thus, the jury's implied finding against Appellant on his self-defense claim is supported by legally sufficient evidence. *See Shannon v. State*, No. 08-13-00320-CR, 2015 WL 6394922, at *4 (Tex. App.—El Paso Oct. 21, 2015, no pet.) (not designated for publication) (significant differences between defendant's versions of the facts allowed the jury to rationally conclude that the claim was fabricated and reject the claim).

Accordingly, Appellant's sole issue is overruled.

### III. Conclusion

We affirm the judgment supporting Appellant's conviction.

LISA J. SOTO, Justice

July 21, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)